IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 4:23-CR-74-SA-JMV

STANLEY SELF, JR.                                                        DEFENDANT

ORDER AND MEMORANDUM OPINION

Before the Court is Stanley Self, Jr.'s Motion to Dismiss Indictment [21]. The Government opposes the Motion [21]. Having reviewed the parties' filings and the applicable authorities, the Court is prepared to rule.

*Relevant Factual and Procedural Background*

The Government alleges that on or about May 2, 2023, Self knowingly possessed ammunition, as evidenced by spent shell casings found after a traffic stop and subsequent shooting allegedly involving Self.

Section 922(g)(1) provides, in pertinent part, that "[i]t shall be unlawful for any person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year to. . . possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1). The Government alleges that Self has been convicted of robbery and aggravated assault in 2019 and burglary and breaking and entering of a vehicle in 2018. Accordingly, the Government charged Self with a violation of Section 922(g)(1) in a single-count Indictment [6] due to the alleged events of May 2, 2023.

In his Motion [21], Self seeks dismissal of the Indictment [6]. He contends that Section 922(g)(1) is unconstitutional as applied to him in light of the recent Supreme Court decision in *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, --- U.S. ---, 142 S. Ct. 2111, 213 L. Ed. 2d

387 (2022). In opposition, the Government asserts that Section 922(g)(1) remains constitutional under *Bruen*.

*Legal Standard*

Pursuant to Federal Rule of Criminal Procedure 12, "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." FED. R. CRIM. P. 12(b)(1). If a pretrial motion presents a question of law in a case of undisputed facts, Rule 12 authorizes the Court to rule on the motion. *United States v. Flores*, 404 F. 3d 320, 325 (5th Cir. 2005).

Here, Self's Motion [21] does not require the resolution of any disputed facts regarding Self's indictment or prior convictions. Therefore, the Court may rule on the motion pursuant to Rule 12.

*Analysis and Discussion*

The Court will set forth relevant pre-*Bruen* precedent before turning to *Bruen* and the parties' arguments.

I.      *The Fifth Circuit and Section 922(g)(1)*

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II. The Fifth Circuit has consistently held that the Second Amendment does not prohibit Congress from barring felons from possessing firearms.

The relevant caselaw on this issue begins with *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001). In *Emerson,* the Fifth Circuit considered the constitutionality of a separate provision of Section 922(g)—specifically, Section 922(g)(8), which prohibits the possession of firearms by individuals subject to domestic violence restraining orders. *Id*. at 264. Following exhaustive textual

2

and historical analyses, the Fifth Circuit held that "the Second Amendment protects the rights of individuals to privately keep and bear their own firearms . . . regardless of whether the particular individual is then actually a member of a militia." *Id*. Even so, the court recognized that the Second Amendment's protection of individual rights may be made subject to restrictions consistent with the right "as historically understood in this country." *Id*. at 261. By way of example, in *dicta*, the court noted that "it is clear that felons, infants and those of unsound mind may be prohibited from possessing firearms." *Id*. (citing Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 266 (1983) ("Nor does it seem that the Founders considered felons within the common law right to arms or intended to confer any such right upon them.")) (additional citations omitted). Ultimately, the court upheld the constitutionality of Section 922(g)(8) as applied to the defendant. *Id*. at 264.

Next, in *United States v. Darrington*, 351 F.3d 632, 634 (5th Cir. 2003), the Fifth Circuit considered a Second Amendment challenge to Section 922(g)(1)—the statute at issue here. Relying on the lengthy historical analysis in *Emerson*, as well as the *Emerson* court's statement that "it is clear that felons . . . may be prohibited from possessing firearms," the *Darrington* court upheld the constitutionality of Section 922(g)(1). *Id*. at 633-34 ("legislative prohibitions on the ownership of firearms by felons are not considered infringements on the historically understood right to bear arms protected by the Second Amendment") (citing *Emerson*, 270 F.3d at 226 n. 21, 261).

Five months later, in *United States v. Everist*, 368 F.3d 517 (5th Cir. 2004), the Fifth Circuit again considered a Second Amendment challenge to Section 922(g)(1). Rather than relying on *Darrington*, the *Everist* court independently relied on the same statements in *Emerson* to conclude that Section 922(g)(1) passes constitutional muster. *Id*. at 519.

Several years later, in *United States v. Anderson*, 559 F.3d 348 (5th Cir. 2009), the Fifth Circuit considered whether *Darrington* survived the Supreme Court's intervening decision in *District of Columbia v. Heller*, 554 U.S. 570, 592, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). In *Heller*, the Supreme Court held that the Second Amendment "codified a pre-existing right" of the individual to "possess and carry weapons in case of confrontation." *Id*. (emphasis omitted).[1] In so holding, the Court invalidated the District of Columbia's ban on the possession of useable handguns in the home. *Id*. at 573, 128 S. Ct. 2783. Still, the *Heller* Court recognized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id*. at 626, 128 S. Ct. 2783. In *dicta*, the Court noted that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]" *Id*. In the corresponding footnote, the Supreme Court described these traditional restrictions on firearm possession as a non-exhaustive list of "presumptively lawful regulatory measures." *Id*. at 627, 128 S. Ct. 2783. Therefore, in *Anderson*, citing *Heller*'s approval of prohibitions on the possession of firearms by felons, the Fifth Circuit reaffirmed *Darrington* and the constitutionality of Section 922(g)(1). 559 F.3d at 352 (citing *Heller*, 554 U.S. at 626, 128 S. Ct. 2783).

The following year, in *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010), the Fifth Circuit once again reiterated that Section 922(g)(1) did not infringe upon Second Amendment rights. The *Scroggins* court emphasized that prior to *Heller*, in *Darrington*, *Everist*, and *Emerson*, "this circuit had already recognized an individual right to bear arms, and had determined that criminal prohibitions on felons (violent or nonviolent) possessing firearms did not violate that

---

[1] Following *Heller*, in *McDonald v. City of Chicago*, 561 U.S. 742, 750,130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010), the Supreme Court held that "the Second Amendment right is fully applicable to the States" through the Fourteenth Amendment. Notably, the Court repeated *Heller*'s assurances that the holding should not "cast doubt on such longstanding regulatory measures as 'prohibitions of firearms by felons and the mentally ill.'" *Id*. at 786, 130 S. Ct. 3020.

right." *Id.* (citing *Darrington*, 351 F.3d at 633-34; *Everist*, 368 F.3d at 519; *Emerson*, 270 F.3d at 260-61). Pointing to *Anderson*, the Fifth Circuit noted that "[it had] reaffirmed [its] prior jurisprudence on this point since *Heller* was decided." *Id.* (citing *Anderson*, 559 F.3d at 352) ("*Heller* provides no basis for reconsidering *Darrington*.").

Because *Heller* clarified the nature of Second Amendment rights but did not explicitly announce a framework with which to evaluate firearm regulations, the Fifth Circuit, as well as other circuits, adopted a two-step inquiry to determine whether a law might infringe upon Second Amendment rights. *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives ("NRA")*, 700 F.3d 185, 194 (5th Cir. 2012) (adopting but "sketch[ing] a skeleton" of the two-step inquiry); *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016) (applying the two-step inquiry). The Fifth Circuit set forth the inquiry as follows:

> First, we ask whether the conduct at issue falls within the scope of the Second Amendment right. To make that determination, we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee. If the burdened conduct falls outside the scope of the Second Amendment, then the law is constitutional and the inquiry is over. Otherwise, we proceed to step two, where we must determine and apply the appropriate level of means-end scrutiny—either strict or intermediate.

*United States v. McGinnis*, 956 F.3d 747, 753 (5th Cir. 2020) (internal citations and quotations omitted).

Since the adoption of the two-step inquiry, the Fifth Circuit has reaffirmed its prior jurisprudence upholding the constitutionality of Section 922(g)(1). *See United States v. Massey*, 849 F.3d 262, 266 (5th Cir. 2017). Thus, to summarize, both before and after *Heller*, and before and after the adoption of the two-step inquiry, the Fifth Circuit found that Section 922(g)(1) does not infringe upon Second Amendment rights.

This brings the Court to *Bruen*, which modified the two-step inquiry.

II.     *Bruen and The Fifth Circuit Post-Bruen*

In *Bruen*, the Supreme Court expressly abrogated the means-end scrutiny aspect of the post-*Heller* two-step inquiry:

> Despite the popularity of this two-step approach, it is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

142 S. Ct. at 2127.

> With step two abrogated, the *Bruen* Court defined the proper test as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 2129-30 (internal quotation and citation omitted).

Self contends that, in light of *Bruen* and the Fifth Circuit's subsequent decisions in *United States v. Rahimi*, 61 F.4th 443 (5th Cir.) *cert. granted*, --- U.S. ----, 143 S. Ct. 2688, --- L. Ed. 2d ---- (2023) and *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), the Court should find that Section 922(g)(1) is unconstitutional as applied to him.

As an initial matter, district courts have held that *Bruen*'s abrogation of the means-end scrutiny step does not "unequivocally overrule" the Fifth Circuit precedent outlined above, which concluded that, based on the text and history of the Second Amendment, Section 922(g)(1) is constitutional. *United States v. Thompson*, --- F. Supp. 3d---, 2023 WL 3159617, at *4 (E.D. La.

Apr. 27, 2023) (citing *United States v. Clay*, 2023 WL 3059155, at *2 (S.D. Tex. Apr. 23, 2023) ("[T]he Fifth Circuit has previously held that restrictions prohibiting convicted felons from possessing firearms do not violate the Second Amendment. Nothing in *Bruen* changed those holdings, which remain binding."); *United States v. Mosley*, 2023 WL 2777473, at *2 (N.D. Tex. Apr. 4, 2023) ("The Fifth Circuit has held that restrictions prohibiting convicted felons from possessing firearms do not violate the Second Amendment. *Bruen* did not change that fundamental premise."); *United States v. Grinage*, 2022 WL 17420390, at *3 (W.D. Tex. Dec. 5, 2022) ("Nothing in the *Bruen* decision calls into question the precedential effect of Fifth Circuit decisions finding § 922(g)(1) constitutional based on the Second Amendment's text and history.")). *Darrington*—and the subsequent cases that found Section 922(g)(1) constitutional—relied on the historical analysis set forth in *Emerson*. 351 F.3d at 634 ("*Emerson* also discusses authority that legislative prohibitions on the ownership of firearms by felons are not considered infringements on the historically understood right to bear arms protected by the Second Amendment.") (citing *Emerson*, 270 F.3d at 226 n. 21). Thus, *Bruen*'s new step two, which mandates an affirmative showing that the challenged regulation is "consistent with the Nation's *historical tradition* of firearm regulation," does not decidedly overrule *Darrington* and subsequent precedent. *See Bruen*, 142 S. Ct. at 2129-30 (emphasis added); *see also United States v. Jordan*, 650 F. Supp. 3d 531, 537-38 (W.D. Tex. 2023) (pre-*Bruen* cases upholding Section 922(g)(1) did not "expressly appl[y] the two-part test that *Bruen* abrogated. To the contrary, all of the cases build their foundation on *Emerson*, which based its conclusion . . . on historical analysis, and did not explicitly apply means-end scrutiny or interest-balancing.").

   Further strengthening this point, while the Fifth Circuit has not directly addressed a renewed constitutional challenge to Section 922(g)(1) since *Bruen*, it has held, under plain error

review, that "there is no binding precedent explicitly holding that § 922(g)(1) is unconstitutional on its face or as applied[.]" *United States v. Garza*, 2023 WL 4044442, at \*1 (5th Cir. June 15, 2023); *see also United States v. Roy*, 2023 WL 3073266 (5th Cir. Apr. 25, 2023); *United States v. Robinson*, 2023 WL 4304762 (5th Cir. June 29, 2023); *United States v. Ratcliff*, 2023 WL 5972049, at \*1 (5th Cir. Sept. 14, 2023) (holding that "there is no binding precedent explicitly holding that Section 922(g)(1) is unconstitutional" and "it is not clear that *Bruen* dictates such a result").

Crucially, "even if *Bruen* did unequivocally overturn the Fifth Circuit precedent, this Court would not have the authority to declare that to be the case . . . the authority to determine whether the Fifth Circuit's pre-*Bruen* precedent regarding the constitutionality of § 922(g)(1) has been overturned by an intervening change in the law lies with the Fifth Circuit alone." *Thompson*, 2023 WL 3159617 at \*4 (citing *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021)); *see also Jordan*, 650 F. Supp. 3d at 538 ("But the Court need not—and in fact *cannot*—decide whether *Bruen* abrogates the pre-*Bruen* Fifth Circuit cases upholding Section 922(g)(1). That is because the Fifth Circuit's opinion in *Bonvillian* indicates that District Courts have no power to declare that an intervening Supreme Court case inters an otherwise-binding Fifth Circuit case.") (emphasis in original) (citing *Bonvillian*, 19 F.4th at 789-90).

Still, Self contends that the Fifth Circuit's decisions in *Rahimi* and *Daniels* support his constitutional challenge to Section 922(g)(1). In *Rahimi*, the Fifth Circuit concluded that Section 922(g)(8) was unconstitutional, overturning its precedent in light of *Bruen*. *See* 61 F.4th at 443 (emphasis added). But *Rahimi* is "immediately distinguishable" from the case sub judice. *Thompson*, 2023 WL 3159617 at \*3. Not only does *Rahimi* concern an entirely different provision of Section 922(g), in its reasoning, the Fifth Circuit specifically differentiated between the

petitioner there—one subject to a "civil proceeding" who had only been "*suspected* of other criminal conduct"—and the defendant here—a convicted felon. *Rahimi*, 61 F.4th at 452 ("And, while he was *suspected* of other criminal conduct at the time, Rahimi was not a convicted felon or otherwise subject to another 'longstanding prohibition[] on the possession of firearms' that would have excluded him.") (emphasis in original) (quoting *Heller*, 554 U.S. at 626-27). Therefore, contrary to Self's argument, *Rahimi* does not impact Fifth Circuit precedent finding Section 922(g)(1) constitutional. The Fifth Circuit confirmed as much on plain error review in *Garza*. 2023 WL 4044442 at *1 ("[T]here is no binding precedent explicitly holding that § 922(g)(1) is unconstitutional on its face or as applied and [] it is not clear that *Bruen* or *Rahimi* dictate such a result[.]"). As such, the Court declines to reconsider the constitutionality of Section 922(g)(1) based on *Rahimi*.

The Court finds that the same conclusion is warranted with respect to Self's reliance on *Daniels*. There, the petitioner was convicted of violating Section 922(g)(3), which bars the possession of firearms by "unlawful users" of controlled substances. *Daniels*, 77 F.4th at 339. Applying *Bruen* and "emphasizing the narrowness of [its] holding," the Fifth Circuit found Section 922(g)(3) unconstitutional as applied to the petitioner, a regular marijuana user. *Id*. at 355. Like *Rahimi*, *Daniels* does not displace Fifth Circuit precedent on the constitutionality of Section 922(g)(1).

Absent a Fifth Circuit or Supreme Court decision directly addressing the constitutionality of Section 922(g)(1), the Court remains bound by the Fifth Circuit's pre-*Bruen* precedent on the issue. *See United States v. Jackson*, 2023 WL 6881818, at *4 (N.D. Miss. Oct. 18, 2023) (court is bound by pre-*Bruen* precedent until the Fifth Circuit or Supreme Court reach a decision squarely addressing the issue); *United States v. Schnur*, --- F. Supp. 3d ---, 2023 WL 4881383, at *3 (S.D.

Miss. July 31, 2023) (same). Still, in the interest of being thorough and out of an abundance of caution, the Court will consider Self's challenge to Section 922(g)(1) under the *Bruen* decision.[2]

### III.    *Bruen Analysis*

As noted above, *Bruen* announced a two-step test to determine whether a modern firearms law is unconstitutional. 142 S. Ct. at 2129-30. First, the Court begins with the text of the Second Amendment. *Id.* "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* If the conduct is presumptively protected, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. "Only by showing that the law does not tread on the historical scope of the [Second Amendment] right can the government 'justify its regulation.'" *Daniels*, 77 F.4th at 341 (citing *Bruen*, 142 S. Ct. at 2130).

#### A.   *Textual Analysis*

First, the Court examines whether the Second Amendment's plain text facially covers both Self and his conduct. *Bruen*, 142 S. Ct. at 2126.

##### i.    *The Person*

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. CONST. AMEND. II. Self asserts that he is one of "the people" presumptively protected by the Second Amendment. The Government disagrees.

In *Heller*, the Supreme Court explained that the words "the people" have been interpreted throughout the Constitution to "unambiguously refer[] to all members of the political community,

---

[2] The Court notes that in his Motion [21], Self asks the Court to find Section 922(g)(1) unconstitutional "as-applied to him." [21] at p. 1. However, he argues generally that the law is unconstitutional, without reference to his particular circumstances. Therefore, the Court views Self's challenge as a facial challenge. "To sustain a facial challenge, 'the challenger must establish that no set of circumstances exists under which the [statute] would be valid.'" *McGinnis*, 956 F.3d at 752 (citation omitted).

10

not an unspecified subset." 554 U.S. at 580, 128 S. Ct. 2783. Thus, the *Heller* Court began its analysis with the "strong presumption that the Second Amendment right is exercised individually and belongs to *all* Americans." *Id*. at 581, 128 S. Ct. 2783 (emphasis added). Notably, *Heller* went on to address only the first part of that presumption, holding that the Second Amendment protected a private individual right as opposed to a collective right without discussing the second part of the presumption, i.e., to whom the individual right belongs. *Id*. at 606-22, 128 S. Ct. 2783. The *Heller* Court later cautioned that it did "not undertake an exhaustive historical analysis [] of the full scope of the Second Amendment," while also emphasizing that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id*. at 626, 128 S. Ct. 2783. Further, *Heller* (and later *Bruen*) repeatedly referred to "law-abiding" citizens in discussing the Second Amendment's scope. *See Heller*, 554 U.S. at 626, 128 S. Ct. 2783; *Bruen*, 142 S. Ct. at 2134. So, while *Heller* began with the presumption that the Second Amendment right extended to "all Americans," the remainder of the opinion could be seen as constricting the scope of the right to "law-abiding" citizens or at the very least neglecting to define the contours of the right. 554 U.S. at 581, 128 S. Ct. 2783. For these reasons, there is some debate regarding which people the Second Amendment protects. *See Rahimi*, 61 F.4th at 452 ("there is some debate over the extent to which the Court's 'law-abiding' qualifier constricts the Second Amendment's reach").

There are two approaches to "the people" issue, summarized in a dissent by then-Judge Barrett:

> Some maintain that there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope. . . . Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right. . . . These approaches will typically yield the same result; one uses history and tradition to identify the

> scope of the right, and the other uses that same body of evidence to
> identify the scope of the legislature's power to take it away.

*Kanter v. Barr*, 919 F.3d 437, 451-52 (7th Cir. 2019) (Barrett, J., dissenting) (internal citations omitted); *see also Schnur*, 2023 WL 4881383 at *5 ("Are 'the people' law-abiding citizens, such that the Second Amendment does not initially cover felons? Or are 'the people' all Americans, such that the Second Amendment covers felons, and the Government must justify its power to disarm them?").

Based on its reading of *Heller* and *Bruen*, in *Rahimi*, the Fifth Circuit endorsed the second approach. 61 F.4th at 452; *see also Daniels*, 77 F.4th at 342 ("[A]s a general rule, limitations on the Second Amendment come from the traditionally understood restrictions on the right to bear arms, not because ordinary citizens are categorically excluded from the privilege."). However, some courts have concluded that "*Rahimi* does not necessarily foreclose the first approach with respect to convicted felons." *Schnur*, 2023 WL 4881383 at *5 (citing *United States v. Zelaya Hernandez*, --- F. Supp. 3d ---, 2023 WL 4161203, at *2-3 (N.D. Tex. June 23, 2023)); *see also Jackson*, 2023 WL 6881818 at *5; *United States v. Robinson*, 2023 WL 4304762, at *2 (N.D. Tex. June 29, 2023). First, the *Rahimi* court interpreted *Heller*'s reference to "law-abiding" citizens as "shorthand" used to explain that "its holding (that the amendment codifies an individual right to keep and bear arms) should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]'" 61 F.4th at 452 (citing *Heller*, 554 U.S. at 627 n. 26, 128 S. Ct. 2783). The court found that "*Bruen*'s reference to 'ordinary, law-abiding' citizens is no different." *Id.* (citing *Bruen*, 142 S. Ct. at 2134). Crucially though, the Fifth Circuit took no position as to whether *Heller* excluded these longstanding prohibitions from its discussion because the Second Amendment does not initially cover felons and the mentally ill *or* because

history and tradition support the legislature's power to deprive those groups of the right to bear arms.

What's more, the *Rahimi* court concluded that the defendant was among "the people" protected by the Second Amendment because he was "not a convicted felon or otherwise subject to another longstanding prohibition . . .that would have excluded him." 61 F.4th at 452. "Yet if all Americans enjoy the right, i.e., if then-Judge Barrett's second approach is the correct analytical framework, then whether Mr. Rahimi was a felon would be irrelevant in determining whether he was part of 'the people' covered by the Second Amendment." *United States v. Melendez-Machado*, --- F. Supp. 3d ---, 2023 WL 4003508, at *3 (W.D. Tex. June 14, 2023).

While the Fifth Circuit's discussion of this issue is less than clear, because it has nevertheless explicitly endorsed the approach that all Americans enjoy Second Amendment protections, the Court assumes, without deciding, that Self is one of "the people" protected by the Second Amendment and proceeds to the remainder of the inquiry. *See Schnur*, 2023 WL 4881383 at *6 (despite uncertainty, given *Rahimi*'s express preference for the second approach, court proceeded to historical analysis).

> ## ii.     The Conduct

Again, the Second Amendment protects "the right of the people to keep and bear Arms." U.S. CONST. AMEND. II. "[T]he most natural reading of 'Keep Arms' in the Second Amendment is to 'have weapons.'" *Heller*, 554 U.S. at 582, 128 S. Ct. 2783. With respect to the form of weapon, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*.

As noted, the Indictment [6] charges Self with knowingly possessing ammunition as a convicted felon, in violation Section 922(g)(1). "The right to keep and bear arms . . . 'implies a

13

corresponding right to obtain the bullets necessary to use them[.]'" *Luis v. United States*, 578 U.S. 5, 26, 136 S. Ct. 1083, 194 L. Ed. 2d 256 (2016) (Thomas, J., concurring) (quoting *Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) *abrogated by Bruen*, 142 S. Ct. at 2127). Accordingly, the Court finds that Section 922(g)(1)'s prohibition against the possession of ammunition by felons regulates conduct that is presumptively covered by the plain text of the Second Amendment. *See City and Cnty. of San Francisco*, 746 F.3d at 967 ("[restriction on ammunition] regulates conduct within the scope of the Second Amendment").

### B. Historical Analysis

Because Self and his alleged conduct are presumptively protected by the Second Amendment, the burden now shifts to the Government to show that Section 922(g)(1) is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. The required level of consistency—"distinctly similar" or "relevantly similar"—depends on whether the challenged regulation addresses an "unprecedented societal concern." *Id*. at 2132. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century," a "distinctly similar" historical regulation addressing that problem is relevant evidence that the challenged regulation is consistent with the Second Amendment. *Id*. at 2131. On the other hand, a modern regulation implicating "unprecedented societal concerns or dramatic technological changes" need only be "relevantly similar" to historical regulations. *Id*. at 2132.

Section 922(g)(1) addresses unprecedented societal concerns. Its precursor, the Federal Firearms Act of 1938, was passed in response to increased organized crime and gang violence that took root in America during Prohibition. *See* Conrad Kahn, *Challenging the Federal Prohibition on Gun Possession by Nonviolent Felons*, 55 S. Tex. L. Rev. 113, 115-16 (2013). The first prohibition against felon firearm possession applied to those "convicted of a crime of violence."

14

*Id.* In 1961, Congress expanded the prohibition to all felons in response to the perceived "infiltration of racketeering into [] society and the exploding crime rate [that had] increasingly become a cause for national concern." Jeffery Giancana, *The "Scourge" of Armed Check Fraud: a Constitutional Framework for Prohibited Possessor Laws*, 51 U. MICH. J. L. REFORM 409, 416 (2018) (citing H.R. REP. NO. 87-1202, at 3068 (1961)). Therefore, "the 'relevantly similar' standard applies." *Melendez-Machado*, 2023 WL 4003508 at *4 (citations omitted).

To determine whether a modern regulation is "relevantly similar" to a historical regulation, the Court considers "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense[.]" *Bruen*, 142 S. Ct. at 2133 (citing *McDonald*, 561 U.S. at 767, 130 S. Ct. 3020 in turn quoting *Heller*, 554 U.S. at 599, 128 S. Ct. 2783) (internal quotations omitted) (emphasis added). "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id.* (internal quotation marks and emphasis omitted). Importantly, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis in original).

Here, the Government directs the Court's attention to historical bans on gun ownership by enslaved people and Native Americans, as well as proposals made during the ratification debates. *See* [22] at p. 7-8. According to the Government, these measures demonstrate historical support for categorical limits on the right to bear arms, including the disarmament of persons deemed dangerous or a threat to public safety. *See id.* (citing *Schnur*, 2023 WL 4881383 at *9).

"Restrictions on the possession of firearms date to England in the late 1600s, when the government disarmed non-Anglican Protestants who refused to participate in the Church of England" and those deemed "dangerous to the Peace of the Kingdom." *United States v. Jackson*,

15

69 F.4th 495, 502 (8th Cir. 2023) (citing JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 45 (1994); Militia Act of 1662, 13 & 14 Car. 2 c. 3, § 13). "Disaffection and dangerousness were often associated with religious differences in this period." *United States v. Barber*, 2023 WL 1073667, at *9 (E.D. Tex. Jan. 27, 2023). Catholics who refused to take an oath of loyalty were disarmed, except as allowed by Order of the Justices of the Peace for self-defense. An Act for the Better Securing the Government by Disarming Papists and Reputed Papists, 1 W. & M., Sess. 1, ch. 15 (Eng. 1688)); *see also* ADAM WINKLER, GUNFIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA 115 (2011) (explaining that Parliament disarmed Catholics because the Protestant majority found them "untrustworthy"). When Catholics controlled the government, they disarmed Protestants due to similar fears that they would revolt. *Barber*, 2023 WL 1073667 at *9 (citing Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 259 n. 56 (2020)). The English Bill of Rights cemented Parliament's authority to determine which citizens could bear arms, declaring: "Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, *as allowed by Law*." An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown, 1 W. & M., Sess. 2, ch. 2, § 7 (Eng. 1689) (emphasis added); *see Bruen*, 142 S. Ct. at 2141-42 (describing the English Bill of Rights as the predecessor to the Second Amendment). In short, "England had established a tradition of disarming dangerous persons, which included both violent persons and persons considered to be disaffected and threatening to the Crown." *Barber*, 2023 WL 1073667 at *9.

In colonial America, the earliest firearm legislation similarly imposed status-based restrictions on the right to bear arms. *See Range v. Att'y Gen. United States*, 53 F.4th 262, 276 n. 18 (3d Cir. 2022) *vacated for rehearing en banc*, 56 F.4th 992 (3d Cir. 2023). Religious minorities,

particularly Catholics, were subject to disarmament in Maryland, Virginia, and Pennsylvania. Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794*, 16 LAW & HIST. REV. 567, 576 (1998); *see also* Greenlee, *supra*, at 263; *Range*, 53 F.4th at 276, 278-79 (describing Massachusetts's disarmament of the Antimonians and Pennsylvania's disarmament of Quakers, Mennonites, Moravians, and others). Many colonies also denied gun ownership to Native Americans, both enslaved and free Black people, and indentured servants. Bellesiles, *supra*, at 576.

As emphasized by the Third Circuit in *Range*, these restrictions are morally repugnant and unconstitutional, and the Court rejects the notion that distinctions based on race, class, and religion correlate with disrespect for the law or dangerousness. 53 F.4th at 276 n.18. Instead, these regulations are relevant in that they demonstrate that "legislatures had the power and discretion to use status as a basis for disarmament" and that "status-based bans did not historically distinguish between violent and non-violent members of disarmed groups." *Id.* at 275, 276 n. 18 (noting that Catholics were disarmed not because they all had a demonstrated propensity for violence but because they were perceived as disrespectful and disobedient to the Crown, as evidenced by the fact that their rights to weapons were restored if they took an oath of loyalty).

The Government next cites amendments proposed during the ratification debates as historical support for the legislative power to categorically disarm felons. "New Hampshire's proposal, the only one approved by a majority, provided: 'Congress shall never disarm any Citizen, unless such as are or have been in actual Rebellion.'" *Barber*, 2023 WL 4161203 at *10 (citing 1 JONATHAN ELLIOT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 326 (2d ed. 1891)). At the Massachusetts ratifying convention, Samuel Adams proposed an amendment to reflect that the Constitution "be never construed . . . to prevent

17

the people of the United States who are peaceable citizens, from keeping their own arms." *Id*. (citing 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 675, 681 (1971)). The minority proposal in Pennsylvania read: "That the people have a right to bear arms for the defense of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals*." 2 Schwartz, *supra*, at 665 (emphasis added).

In *Rahimi*, the Fifth Circuit found that these proposals "might somewhat illuminate the scope of firearm rights at the time" but they were "not reflective of the Nation's early understanding of the scope of the Second Amendment right" because they were not ultimately ratified. 61 F.4th at 457. Thus, concluded the Fifth Circuit, "they cannot counter the Second Amendment's text, or serve as an analogue for § 922(g)(8)." *Id*. The Court notes that there is some debate over whether the failure of the proposals indicates that they were not persuasive. Some courts and scholars have attributed the failure to a lack of support by Federalists, who were in the majority in some states and opposed the inclusion of a bill of rights in the Constitution. *See United States v. Coombes*, 629 F. Supp. 3d 1149, 1159 (N.D. Okla. 2022) (citing Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1374-75 (2009)). What's more, "although some scholars have pointed out that the Second Amendment as ratified did not explicitly limit the right to virtuous or peaceable persons or exclude felons, other scholars have suggested that no objection was made because the exclusions were understood." *Id*. (citing STEPHEN P. HALBROOK, THE FOUNDERS' SECOND AMENDMENT: ORIGINS OF THE RIGHT TO BEAR ARMS 273 (updated ed. 2008)). Nevertheless, because the Court is bound by the Fifth Circuit's conclusion that the proposals are not reflective of the Nation's early understanding of the scope of Second Amendment rights, the Court will not

18

consider the proposals as evidence of the legislative power to categorically disarm felons. However, even setting aside the proposals, due to other historical regulations discussed herein, the Court is satisfied that there is historical support for the disarmament of certain categories of persons due to concerns for public safety and the maintenance of social order. *See Schnur*, 2023 WL 4881383 at *10; *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) ("In sum, founding era legislatures categorically disarmed groups whom they judged to be a threat to the public safety.").

Next, the Court turns to loyalty laws from the Revolutionary War era. At that time, inadequate faithfulness to new state governments resulted in disarmament. *See* Greenlee, *supra*, at 263-64. "[T]he Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty." *Jackson*, 69 F.4th at 503 (collecting statutes and citing 4 JOURNALS OF THE CONTINENTAL CONGRESS, 1774-1789 205 (Worthington Chauncey Ford ed., 1906)).

The Court notes that in *Rahimi*, the Fifth Circuit "question[ed] . . . whether colonial and state laws disarming categories of 'disloyal' or 'unacceptable' people present tenable analogues to § 922(g)(8)." 61 F.4th at 457. For one, the court opined that the laws "may well have been targeted at groups excluded from the political community—i.e., written out of 'the people' altogether." *Id*. Second, the Fifth Circuit found that these laws' utility as historical analogues to Section 922(g)(8) was "dubious, at best" because they were aimed at "preservation of the political and social order, not the protection of an identified person from the threat of 'domestic gun abuse.'" *Id*.

The Court is not persuaded that such laws are untenable historical analogues to Section 922(g)(1). First, particularly with respect to loyalty laws, "it is far from settled that those disarmed were considered outside the political community. It would be important to know, for example, whether disarmed individuals were also barred from voting or other political participation."

*Melendrez-Machado*, 2023 WL 4003508 at *8. And the Fifth Circuit's second critique clearly does not apply to Section 922(g)(1), which *is* aimed at the preservation of social order. *See Schnur*, 2023 WL 4881383 at *9 (citing *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 112 n. 6, 119, 103 S. Ct. 986, 74 L. Ed. 2d 845 (1983)).

This brings the Court to whether laws disarming disloyal or unacceptable groups are "relevantly similar" to Section 922(g)(1), considering *how* and *why* the laws burden the Second Amendment right. *Bruen*, 142 S. Ct. at 2132-33 (emphasis added). The laws above fully disarmed certain groups deemed untrustworthy (the how), and Section 922(g)(1) fully disarms felons. As such, Section 922(g)(1) imposes a burden upon convicted felons that is comparable to that of the historical statutes. *See Schnur*, 2023 WL 4881383 at *9.[3]

As to the *why*, the colonies and early states disarmed Native Americans, enslaved people, and those perceived as disloyal to curtail threats of violence and ensure the security of the state. *Rahimi*, 61 F.4th at 457; *see also* Greenlee, *supra*, at 261 (loyalty laws were passed to prevent the opposition from engaging in armed insurrection); *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) ("legislatures disqualified categories of people from the right to bear arms only when they judged that doing so was necessary to protect the public safety"); *Jackson*, 69 F.4th at 505 (legislatures traditionally used status-based restrictions to disarm categories of people based on their perceived deviation from the legal norm or unacceptable risk of violence). Notably, some courts have pointed out that dangerousness was not necessarily the primary justification for disarming those who

---

[3] The Court notes that loyalty laws and laws disarming Catholics allowed for rearmament if a citizen disavowed his previous loyalties or religion and swore allegiance to the government. However, the Court emphasizes *Bruen*'s requirement that the "relevantly similar" regulation need only be a "historical *analogue*, not a historical twin." *Bruen*, 142 S. Ct. at 2132-33 (emphasis in original). As aptly stated by the United States District Court for the Western District of Texas, "expecting modern firearms laws like § 922(g)(1) to permit rearmament of felons who pinky-swear to obey the law going forward is unrealistic and would bind courts within the kind of 'regulatory straightjacket' that *Bruen* disallowed." *Melendrez-Machado*, 2023 WL 4003508 at *8 (citing *Bruen*, 142 S. Ct. at 2133).

refused to take an oath of loyalty. *See Melendrez-Machado*, 2023 WL 4003508 at *7 (citing *Range*, 53 F.4th at 275 in turn citing Malcolm, *supra*, at 45); *Jackson*, 69 F.4th at 503-04. Like in England, "Maryland, Virginia, and Pennsylvania disarmed Catholics in 1756 arguably 'because the Protestant majorities in those colonies viewed Catholics as defying sovereign authority and communal values,' not because they posed a uniform threat of violence or resistance." *Melendrez-Machado*, 2023 WL 4003508 at *7 (citing *Range*, 53 F.4th at 277).

As noted above, Section 922(g)(1) was enacted in response to widespread organized crime and violence. *See* Kahn, *supra*, at 115-16; Giancana, *supra*, at 416. Like the historical statutes, Section 922(g)(1) disarms felons due to both public safety concerns and their overall failure to conform to legal norms. *See Jackson*, 2023 WL 6881818, at *7 (citing *Dickerson*, 460 U.S. at 119, 103 S. Ct. 986) ("Congress obviously determined that firearms must be kept away from persons, such as those convicted of serious crimes, who might be expected to misuse them."). Thus, the rationale of the historical regulations (public safety, security of the state, respect for the rule of law) matches that of Section 922(g)(1) (preventing violence and lawlessness).

Accordingly, the Court finds that historical laws disarming "untrustworthy" or "disloyal" groups are sufficiently analogous to Section 922(g)(1). Therefore, Section 922(g)(1) passes constitutional muster under *Bruen*. The Court notes that numerous district courts in this circuit have reached the same conclusion. *See, e.g., Jackson*, 2023 WL 6881818, at *7; *Schnur*, 2023 WL 4881383, at *10; *Melendrez-Machado*, 2023 WL 4003508, at *8; *Barber*, 2023 WL 1073667, at *9; *Zelaya-Hernandez*, 2023 WL 4161203, at *9; *United States v. Banuelos*, 2022 WL 17752205, at *5 (W.D. Tex. Nov. 10, 2022).

*Conclusion*

For the reasons set forth above, Self's Motion to Dismiss Indictment [21] is DENIED.

SO ORDERED, this the 4th day of January, 2024.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE